No. 24-2204

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

IN RE: ON24, INC. SECURITIES LITIGATION,
LEADERSEL INNOTECH ESG,

*Plaintiff-Appellant*,

v.

ON24, INC.; SHARAT SHARAN; STEVEN VATTUONE; DENISE PERSSON; HOLDGER STAUDE, DOMINIQUE TREMPONT; BARRY ZWARENSTEIN; GOLDMAN SACHS & CO. LLC; J.P. MORGAN SECURITIES LLC; KEYBANC CAPITAL MARKETS INC.; ROBERT W. BAIRD & CO. INCORPORATED; CANACCORD GENUITY LLC; NEEDHAM & COMPANY, LLC; PIPER SANDLER & CO.; WILLIAM BLAIR & COMPANY L.L.C.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of California, Oakland Division
Case No. 4:21-cv-8578 (YGR)

## DEFENDANTS-APPELLEES' CONSOLIDATED RESPONSE BRIEF

ANNA ERICKSON WHITE
DAVID J. WIENER
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

BRIAN R. MATSUI
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, DC 20037
Tel.: (202) 887-8784
BMatsui@mofo.com

ALEXANDRA M. AVVOCATO
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019

*Counsel for Defendants-Appellees ON24, Inc., Sharat Sharan, Steven Vattuone, Denise Persson, Holger Staude, Dominique Trempont, and Barry Zwarenstein*

*Additional counsel listed on inside cover*

SEPTEMBER 27, 2024

THOMAS M. PETERSON
CHARLENE S. SHIMADA
KEVIN M. PAPAY
ROBERT H. O'LEARY
MORGAN, LEWIS & BOCKIUS LLP
One Market
Spear Street Tower
San Francisco, CA 94105
Tel: (415) 442-1000
thomas.peterson@morganlewis.com

*Counsel for Defendants-Appellees*
*Goldman Sachs & Co. LLC; J.P. Morgan*
*Securities LLC; KeyBanc Capital*
*Markets Inc.; Robert W. Baird & Co.*
*Incorporated; Canaccord Genuity LLC;*
*Needham & Company, LLC; Piper*
*Sandler & Co.; and William Blair &*
*Company L.L.C.*

## CORPORATE DISCLOSURE STATEMENTS

ON24 Inc. does not have a parent corporation and no publicly held corporation owns 10% or more of ON24 Inc.'s stock.

Dated:  September 27, 2024                          s/ Brian R. Matsui
_____
                                                          Brian R. Matsui

Goldman Sachs & Co. LLC is a wholly owned subsidiary of The Goldman Sachs Group, Inc. ("Group Inc."), except for de minimis non-voting, non-participating interests held by unaffiliated broker-dealers.  Group Inc. is a corporation organized under the laws of Delaware and whose shares are publicly traded on the New York Stock Exchange.  No other publicly held company owns a 10% or more interest in Goldman Sachs & Co. LLC.

J.P. Morgan Securities LLC is an indirect, wholly owned subsidiary of JPMorgan Chase & Co., which is a publicly held corporation.  JPMorgan Chase & Co. does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.  However, The Vanguard Group, Inc., an investment adviser which is not a publicly held corporation, has reported that registered investment companies, other pooled investment vehicles and institutional accounts that it or its subsidiaries sponsor, manage or advise have aggregate ownership under certain regulation of 10% or more of the stock of JPMorgan Chase & Co.

i

KeyBanc Capital Markets Inc. is wholly owned by KeyCorp, a publicly traded company. No other publicly held corporation owns 10% or more of KeyBanc Capital Markets Inc.'s stock.

Robert W. Baird & Co. Incorporated is wholly owned by Baird Financial Corporation, which, in turn, is wholly owned by Baird Financial Group, Inc. Baird Financial Group, Inc. is a privately held corporation with no parent corporation. No publicly held corporation owns 10% or more of Baird Financial Group, Inc.

Canaccord Genuity LLC is wholly owned by Canaccord Adams Delaware Inc., a private company, which is wholly owned by Collins Stewart Inc., a private company, which is wholly owned by Canaccord Adams Financial Group Inc., a private company, which is wholly owned by Canaccord Genuity Group Inc., a Canadian public company.

Needham & Company, LLC is an indirect, wholly owned subsidiary of the Needham Group, Inc.

Piper Sandler & Co. is a wholly owned subsidiary of Piper Sandler Companies, which is a publicly traded company that has no parent company. The Vanguard Group, Inc. and BlackRock, Inc. have reported that they or their clients, including investment companies registered under the Investment Company Act of 1940 and other managed accounts, own greater than 10% of Piper Sandler Companies' outstanding common stock.

William Blair & Company L.L.C. is a wholly owned subsidiary of WBC Holdings, LP. WBC Holdings, LP has no parent corporation, and no publicly held company owns more than 10% of WBC Holdings, LP.

Dated: September 27, 2024                    s/ Thomas M. Peterson
                                             Thomas M. Peterson

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENTS ...................................................... i

TABLE OF AUTHORITIES .................................................................... vii

JURISDICTIONAL STATEMENT ............................................................ 1

INTRODUCTION ............................................................................... 2

STATEMENT OF THE ISSUE ................................................................ 3

STATEMENT OF THE CASE ................................................................. 4

    A.    Factual Background ................................................................. 4

        1.    Demand for ON24's services increased at the start of the pandemic .................................................................... 4

        2.    ON24's offering documents noted the pandemic's impact on its growth and warned that changes in pandemic restrictions could harm that growth ........................... 6

        3.    ON24 continues to grow throughout 2021 ................................ 8

    B.    Procedural Background ........................................................... 9

        1.    Plaintiff challenges ON24's accurate statements about its customer base and historic growth, ON24's optimistic expectations for future growth opportunities, and ON24's disclosures of pandemic-related risks ........................... 9

        2.    The district court dismisses plaintiff's initial complaint as implausible ......................................................... 13

        3.    Plaintiff's amended complaint fails to cure its pleading deficiencies ........................................................... 14

SUMMARY OF ARGUMENT ................................................................. 17

STANDARD OF REVIEW .................................................................... 20

ARGUMENT ..................................................................................... 21

I.     THE DISTRICT COURT CORRECTLY RULED THAT PLAINTIFF'S SECTION 11 CLAIM FAILS BECAUSE IT HAS NOT ADEQUATELY ALLEGED A MATERIAL MISREPRESENTATION OR OMISSION ................................21

    A.    The District Court Correctly Concluded That Plaintiff's Omissions Theory Is Fatally Contradicted By ON24's Undisputed Financial Metrics ...........................................22

        1.    ON24's undisputed 2020 and 2021 metrics foreclose plaintiff's theories of customer shift and material churn........22

        2.    Plaintiff's attempts to reconcile its theory with these metrics fail........................................................26

            a.    None of plaintiff's arguments suggests its churn theory is factually possible in light of ON24's financial metrics.............................................26

            b.    Given this factual impossibility, plaintiff has also failed to establish a plausible inference that ON24 experienced material churn.............................28

    B.    The District Court Correctly Concluded That Plaintiff's Allegations Are Implausible On Their Own Terms...........................31

        1.    Plaintiff's internally inconsistent allegations that material churn occurred before the IPO, as opposed to mere churn risk, cannot be accepted as true.................................32

        2.    Plaintiff's internally inconsistent allegations that the quantity of churn was material cannot be accepted as true .....36

    C.    The District Court Correctly Concluded In Its First Dismissal Order That Three Of The Challenged Statements (Statements 1–3) Are Non-Actionable Expressions Of Corporate Optimism .......44

    D.    ON24's Risk Disclosures (Challenged Statements 4–6) Were Adequate.........................................................47

    E.    Plaintiff's Reliance On Regulation S-K Fails Because Plaintiff Has Failed To Plausibly Allege That ON24 Failed To Disclose Any Pre-IPO Churn Or Risk Of Post-IPO Churn ..............................53

F.      Plaintiff's Remaining Challenges To The District Court's Ruling Fail ............................................................................ 56

     1.      The district court applied the correct standard ......................... 56

     2.      Plaintiff's isolated challenges to the second statement demonstrate no reversible error ................................. 57

II.      PLAINTIFF'S SECTION 15 CLAIM FAILS FOR THE SAME REASONS .......................................................................... 59

CONCLUSION ........................................................................ 60

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alaska Ctr. For Env't v. U.S. Forest Serv.*,
189 F.3d 851 (9th Cir. 1999) .................................................................4

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) .................................................50, 51, 52

*Armstrong v. Brown*,
768 F.3d 975 (9th Cir. 2014) ....................................................40, 42

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................................28, 49

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)...................................................................21, 40

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).........................................................................20

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ....................................................21, 34

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) .......................................................28

*In re Convergent Techs. Sec. Litig.*,
948 F.2d 507 (9th Cir. 1991) ....................................................50, 52

*CTIA - The Wireless Ass'n v. City of Berkeley*,
928 F.3d 832 (9th Cir. 2019) .........................................................37

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) .......................................................44

*DB Healthcare, LLC v. Blue Cross Blue Shield of Ariz., Inc.*,
852 F.3d 868 (9th Cir. 2017) .........................................................57

*Dreiling v. Am. Express Co.*,
458 F.3d 942 (9th Cir. 2006) ...........................................................4

*Eclectic Props. E., LLC v. Marcus & Millichap Co.,*
751 F.3d 990 (9th Cir. 2014) ...................................................20, 29, 30, 31, 38

*Epic Games, Inc. v. Apple, Inc.,*
67 F.4th 946 (9th Cir. 2023) ................................................................................57

*In re Facebook, Inc. Sec. Litig.,*
87 F.4th 934 (9th Cir. 2023) ...........................................................50, 51, 52, 53

*In re Gilead Scis. Sec. Litig.,*
536 F.3d 1049 (9th Cir. 2008) .....................................................................21, 22

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.,*
63 F.4th 747 (9th Cir. 2023) ...............................................................................37

*Gonzalez v. Planned Parenthood of L.A.,*
759 F.3d 1112 (9th Cir. 2014) ............................................................................25

*Hicks v. PGA Tour, Inc.,*
897 F.3d 1109 (9th Cir. 2018) ......................................................................39, 42

*Kendall v. Visa U.S.A., Inc.,*
518 F.3d 1042 (9th Cir. 2008) ............................................................................60

*Lloyd v. CVB Fin. Corp.,*
811 F.3d 1200 (9th Cir. 2016) ............................................................................45

*Macomb Cnty. Emps. Ret. Sys. v. Align Tech., Inc.,*
39 F.4th 1092 (9th Cir. 2022) .......................................................................41, 45

*Melot v. JAKKS Pac., Inc.,*
No. 13-cv-05388 JAK, 2014 WL 12589334
(C.D. Cal. June 6, 2014) .....................................................................................58

*New v. Armour Pharm. Co.,*
67 F.3d 716 (9th Cir. 1995) ..........................................................................31, 38

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension
Fund,*
575 U.S. 175 (2015)....................................................... 20, 33, 34, 35, 45, 46, 47

*Orellana v. Mayorkas,*
6 F.4th 1034 (9th Cir. 2021) .........................................................................31, 38

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ................................................................45, 46

*Ramsey v. Kantor*,
    96 F.3d 434 (9th Cir. 1996) ..............................................................................37

*In re Rigel Pharms., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) ............................................................20, 21, 59

*Silverstrand Invs. v. AMAG Pharms., Inc.*,
    707 F.3d 95 (1st Cir. 2013)................................................................................54

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013) ............................................................................33

*In re Stac Elecs. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996) ........................................48, 49, 50, 52

*Steckman v. Hart Brewing, Inc.*,
    143 F.3d 1293 (9th Cir. 1998) ..................................................................25, 55

*Steinle v. City & Cnty. of S.F.*,
    919 F.3d 1154 (9th Cir. 2019) ..........................................................................59

*Sully v. Ayers*,
    725 F.3d 1057 (9th Cir. 2013) ..........................................................................44

*In re Syntex Corp. Sec. Litig.*,
    95 F.3d 922 (9th Cir. 1996) ..............................................................................45

*In re Verifone Sec. Litig.*,
    784 F. Supp. 1471 (N.D. Cal. 1992)................................................................52

*Weisbuch v. Cnty. of L.A.*,
    119 F.3d 778 (9th Cir. 1997) ....................................................................21, 33

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) ............................................................................50

*Yourish v. Cal. Amplifier*,
    191 F.3d 983 (9th Cir. 1999) ............................................................................28

**Statutes and Regulations**

15 U.S.C. § 77k ........................................................................................27

15 U.S.C. § 77o ........................................................................................59

17 C.F.R. § 229.105(a) .............................................................................53

17 C.F.R. § 229.303(b)(2)(ii) ..............................................................55, 56

**Other Authorities**

54 Fed. Reg. 22427 (May 24, 1989) .........................................................55

Pet. for Writ of Certiorari, *Facebook, Inc. v. Amalgamated Bank*,
   No. 23-980 (U.S. Mar. 4, 2024) ...........................................................53

# JURISDICTIONAL STATEMENT

ON24 Inc., Sharat Sharan, Steven Vattuone, Denise Persson, Holger Staude, Dominique Trempont, Barry Zwarenstein, Irwin Federman, Goldman Sachs & Co. LLC; J.P. Morgan Securities LLC; KeyBanc Capital Markets Inc.; Robert W. Baird & Co. Incorporated; Canaccord Genuity LLC; Needham & Company, LLC; Piper Sandler & Co.; and William Blair & Company L.L.C. agree with plaintiff-appellant's jurisdictional statement.[1]

---

[1] Irwin Federman was a defendant in the district court but is not listed on the caption on appeal.

1

**INTRODUCTION**

Plaintiff's Section 11 complaint depends on an undisputedly false factual premise. Its theory of liability is that during a February 2021 initial public offering ("IPO"), ON24 concealed from investors material customer non-renewal of subscription agreements (what plaintiff calls "churn") and declining demand. But ON24's 2020 and 2021 financial data—which plaintiff never challenges—shows the opposite: ON24 *grew* in multiple key metrics. As the district court concluded, that alone is enough to dismiss plaintiff's complaint. On appeal, plaintiff cannot reconcile its theory with those facts.

Independently, plaintiff's theory is implausible on the face of the complaint itself. As the district court explained, for plaintiff's allegations of material churn to satisfy Rule 8, plaintiff had to explain when and how much churn occurred. Despite being given a second chance, plaintiff failed to do so. Instead, plaintiff's complaint is so riddled with internal inconsistencies that it is impossible to infer *any* amount of material churn, whether before or after the IPO. And far from presenting a coherent story, plaintiff has conceded inconsistencies both here and in the district court.

Thus, all plaintiff is left with is the notion that some unquantified risk of churn existed at the time of the IPO. Yet ON24's offering documents candidly disclosed that risk to investors. In the lead-up to ON24's February 2021 IPO, ON24's digital-platform business experienced significant expansion in part because its products

2

were ideal for companies navigating COVID-19 restrictions on in-person events. The company's offering documents warned that "[a]s the impact of COVID-19 lessens, there may be reduced demand for our platform," and that "[i]f these new customers elect not to continue their subscriptions as the impact of COVID-19 lessens, [its] business, financial condition and results of operations would be harmed." ER-63 (¶181). Despite plaintiff's distortions of this Court's law, ON24 was not required to do more by predicting the future—a future that ON24's metrics show never came to pass.

The judgment should be affirmed.

## STATEMENT OF THE ISSUE

Whether the district court correctly dismissed plaintiff's claims under Sections 11 and 15 of the Securities Act for failure to plausibly allege false or misleading statements or omissions.

## STATEMENT OF THE CASE

### A.     Factual Background[2]

#### 1.     *Demand for ON24's services increased at the start of the pandemic*

ON24 offers "a leading, cloud-based digital experience platform" to help businesses transition from traditional marketing tactics (like cold-calling, networking events, and office visits) to more scalable, digital-based approaches. ER-23 (¶3); 1-SER-46–47.  ON24's customers use the platform to host interactive webinars and virtual events and otherwise provide multimedia content experiences. 1-SER-46.  ON24 makes its money through selling subscriptions to its products. ER-35 (¶63).  "The terms of ON24 subscription agreements are primarily annual" and billed in advance.  ER-35 (¶64).

In 2019, ON24's revenue grew steadily, from $82.6 million to $89.1 million (a growth rate of about 8%).  1-SER-57.  That rate of growth accelerated in 2020 as the COVID-19 pandemic began and numerous businesses turned to ON24 as a

---

[2] Defendants draw the following facts from plaintiff's amended complaint and from exhibits to the declaration of David Wiener, all of which the district court concluded were either incorporated by reference into the complaint or judicially noticeable SEC filings. *Dreiling v. Am. Express Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006); ER-4; ER-88 (district court taking judicial notice of or incorporating exhibits).  Plaintiff does not (and did not) challenge this ruling, which was an appropriate exercise of the district court's discretion.  Nor does it challenge—and thus has waived (or forfeited) any challenge to—how the district court used those documents.  *Alaska Ctr. For Env't v. U.S. Forest Serv.*, 189 F.3d 851, 858 n.4 (9th Cir. 1999) ("Arguments not raised in [the] opening brief are waived.").

remote solution to their marketing needs. ER-23 (¶7). ON24's number of customers grew from 1,401 as of December 31, 2019 to 1,918 as of September 30, 2020. 1-SER-109. And in the first three quarters of 2020, ON24's revenue increased 59% as compared to the year before. ER-23 (¶7).

Plaintiff posits that ON24's growth in 2020 was driven by an influx of "atypical" customers, which it characterizes as small- to medium-sized businesses new to ON24 who signed one-year subscriptions with no intent to renew. ER-24 (¶9). Yet the financial metrics disclosed to investors in the offering documents (the accuracy of which Plaintiff does not dispute) show that its continued growth came from both new and existing customers, including an increasing number of large companies. The company's net retention rate ("NRR"), which reflects "recurring revenue from existing customers," increased from 107% as of December 31, 2018, to 108% as of December 31, 2019, to 147% as of September 30, 2020. 1-SER-47; ER-23–24 (¶7); ER-37 (¶¶71–72). Its annual recurring revenue ("ARR")—which is driven both by "maintain[ing] and expand[ing]" relationships with "existing" customers and by signing up "new customers"—also rose, from $61.2 million as of December 31, 2018, to $76.9 million as of December 31, 2019, to $138.9 million as of September 30, 2020. 1-SER-59; ER-23–24 (¶7); ER-37 (¶¶71–72). In 2020, ON24 also saw an increase in both the percentage of customers with multi-year contracts and the percentage of customers who were contributing at least $100,000

of ARR, which were "generally large organizations." 1-SER-59, 69, 106, 108–09, 111–12.

ON24 nonetheless recognized that the unknown future of the COVID-19 pandemic and accompanying restrictions created uncertainty as to whether some of these new customers would renew their subscriptions. ON24 worked to mitigate any such risk. During monthly sales meetings, ON24 employees identified accounts at risk of non-renewal (or "churn") and discussed "'safe plays' or potential ways to keep the customer on board" and "retain their business." ER-51–52 (¶¶151, 154). ON24's CEO also required employees to "include[] notes in Salesforce as to … what was being done to save [an] account" at risk of non-renewal. ER-56 (¶172).

### 2. ON24's offering documents noted the pandemic's impact on its growth and warned that changes in pandemic restrictions could harm that growth

ON24 conducted its IPO on February 3, 2021, pursuant to several documents filed with the SEC and disseminated to investors (collectively, the "offering documents"). ER-37–38 (¶¶74, 76). In those documents, ON24 disclosed certain historical facts, including that it had over 1,900 customers as of September 30, 2020, and that its ARR growth over the past two years "reflects [its] success in acquiring new customers and expanding subscriptions with existing customers, which was occurring prior to the COVID-19 pandemic and has accelerated in 2020 partly in response to the COVID-19 pandemic." ER-57–59 (¶¶175, 177).

6

ON24 candidly and prominently disclosed to investors the role the pandemic had played in its recent success. And it emphasized the risk that this situation could change. It explained that its "recent revenue growth has been significantly impacted by an increasing demand for [its] platform and products following the onset of the COVID-19 pandemic and resulting precautionary measures." ER-63 (¶181). ON24 warned investors of the obvious corollary to this fact: there was "no assurance that [it] will continue to experience such accelerated growth." 1-SER-112.

The company expressly cautioned that it was "possible that, if the effects of the COVID-19 pandemic subside, [its] customers and their users will resume in-person marketing activities in a way that decreases usage of [ON24's] platform." 1-SER-65. If that happened, ON24 admitted, "there may be reduced demand for [the] platform, and [ON24's] revenue growth rate may decline." ER-63 (¶181). Indeed, this was the very first risk disclosed to investors in the "risk factors" section of the offering documents. 1-SER-61. Specifically, ON24 explained that "[i]f these new customers elect not to continue their subscriptions," ON24's "business, financial condition and results of operations would be harmed." ER-63 (¶181); *see also* ER-63–64 (¶182) (noting again that "[i]f fewer new enrollments or renewals occur as the impact of COVID-19 lessens, [ON24's] cash and deferred revenue as of future dates may decrease"); ER-64 (¶183) (repeating warning that one reason

why "customers may not renew" their subscriptions could be "because of a customer no longer having a need for [ON24's] solutions").

### 3. ON24 continues to grow throughout 2021

ON24's success continued after its IPO. By the end of 2021, ON24's year-over-year revenue growth had increased by 30% (and its subscription revenue specifically increased by 43%). 2-SER-384. Its number of customers also increased to 2,122—compared to 1,994 as of the end of 2020 and 1,918 as of September 30, 2020. 2-SER-379. And its ARR (which, again, reflects revenue from existing and new customers) continued to grow in the fourth quarter of 2020 (1-ER-260) and each quarter of 2021. Figure 1 summarizes ON24's 2021 growth:

| | Q1 2021 | Q2 2021 | Q3 2021 | Q4 2021 | FY 2021 |
|---|---|---|---|---|---|
| **Total Revenue ($000s)** | $50,099 | $52,118 | $49,362 | $52,034 | $203,613 |
| **Year-Over-Year Revenue Growth** | 102% | 43% | 16% | (2%) | 30% |
| **Year-Over-Year ARR Growth** | 90% | 44% | 20% | 12% | 12% |

1-SER-274, 278; 2-SER-289, 295; 2-SER-306, 312, 322; 2-SER-323, 329; 2-SER-379, 384. Yet ON24's 2021 growth just missed the even higher expectations that analysts had set (expectations that were not provided anywhere in ON24's offering documents), and ON24's stock price fell. ER-29 (¶¶26–27).

**B.    Procedural Background**

*1.    Plaintiff challenges ON24's accurate statements about its customer base and historic growth, ON24's optimistic expectations for future growth opportunities, and ON24's disclosures of pandemic-related risks*

Plaintiff filed its initial complaint in March 2022, alleging that six statements ON24 made in its February 2021 offering documents were false or misleading in violation of Sections 11 and 15 of the Securities Act.[3]

Three statements relate to ON24's customer base and growth.  The only portions of those statements that plaintiff characterizes as misleading are depicted in bolded text below:

1) "**As of September 30, 2020, we had over 1,900 customers** in more than 40 countries, including three of the five largest global technology companies, four of the five largest U.S. banks, three of the five largest global healthcare companies and three of the five largest global industrial and manufacturing companies, in each case measured by 2019 revenue.  No single customer contributed more than 5% of our total revenue for the year ended December 31, 2019 or for the nine months ended September 30, 2020.  **We have a highly engaged and loyal customer base that has allowed us to grow our revenue with them over time**, and achieve a dollar-based net retention rate, or NRR of 147% as of September 30, 2020.  Our NRR was 107% and 108% as of December 31, 2018 and December 31, 2019, respectively." ER-57 (¶175).

2) "We believe that ARR is a key metric to measure our business because it is driven by our ability to acquire new subscription customers and to maintain and expand our relationship with existing subscription

---

[3] Plaintiff's initial complaint challenged an additional seven statements; because the amended complaint dropped any challenges to those statements, they are not addressed here.

customers. ARR is calculated as the sum of the annualized value of our subscription contracts as of the measurement date, including existing customers with expired contracts that we expect to be renewed. Our ARR amounts exclude professional services, overages from subscription customers and Legacy revenue. Our ARR was $61.2 million as of December 31, 2018, $63.6 million as of March 31, 2019, $67.2 million as of June 30, 2019, $70.0 million as of September 30, 2019, $76.9 million as of December 31, 2019, $85.9 million as of March 31, 2020, $114.2 million as of June 30, 2020, and $138.9 million as of September 30, 2020. **Our consistent ARR growth each quarter reflects our success in acquiring new customers and expanding subscriptions with existing customers, which was occurring prior to the COVID-19 pandemic and has accelerated in 2020 partly in response to the COVID-19 pandemic.**" ER-59 (¶177).

3) "We believe **we can achieve significant growth by retaining and further penetrating our existing customer base with the addition of new users and new products, and through upsell and cross sell**. Our multi-dimensional dimensional land and expand model drives onboarding and allows us to acquire customers via free trials, live demos and continuous engagement with an efficient sales and marketing investment. As we continue to drive more actionable revenue generating marketing insights, we believe that **we have a significant opportunity to further increase sales among existing customers across different functional and geographic departments within each respective organization**. Our ability to pursue this opportunity will require us to scale our sales and marketing organizations and otherwise increase our operating expenses, and we may not be successful on the timetable we anticipate, or at all, for any number of reasons, which may cause our results to vary from period to period." ER-61 (¶179).

The other three statements come from ON24's fifty-three pages of risk disclosures. The portions of those statements plaintiff challenges as misleading are also depicted in bolded text as follows:

1) "**We may not be able to sustain our recent revenue growth rate in the future.** For the year ended December 31, 2019, our revenue

10

increased by 8% as compared to the year ended December 31, 2018. We have experienced significant revenue growth during 2020, with our revenue increasing by 59% for the nine months ended September 30, 2020 as compared to the nine months ended September 30, 2019. **Our recent revenue growth has been significantly impacted by an increasing demand for our platform and products following the onset of the COVID-19 pandemic and resulting precautionary measures. As the impact of COVID-19 lessens, there may be reduced demand for our platform, and our revenue growth rate may decline. If these new customers elect not to continue their subscriptions as the impact of COVID-19 lessens, our business, financial condition and results of operations would be harmed.**" ER-63 (¶181).

2) "**Our quarterly results may fluctuate significantly and may not fully reflect the underlying performance of our business.** Our quarterly results of operations and financial condition may vary significantly in the future, and period-to-period comparisons may not be meaningful. Accordingly, the results of any one quarter should not be relied upon as an indication of future performance. Our quarterly results of operations and financial condition may fluctuate as a result of a variety of factors, many of which are outside of our control and may not fully reflect the underlying performance of our business. **For example, our revenue and revenue growth rate may decline in future periods compared to 2020 as the impact of COVID-19 lessens.** Further, because we generally invoice our customers at the beginning of the contractual terms of their subscriptions to our solutions, our financial condition reflects deferred revenue that we recognize ratably as revenue over the contractual term. **If fewer new enrollments or renewals occur as the impact of COVID-19 lessens, our cash and deferred revenue as of future dates may decrease.** Fluctuation in quarterly results may negatively impact the value of our securities. **Factors that may cause fluctuations in our quarterly results or operations include … our ability to retain and expand customer usage ….**" ER-63–64 (¶182).

3) "**Failure to attract new customers or retain, expand the usage of, and upsell our products to existing customers would harm our business and growth prospects.** We derive, and expect to

continue to derive, a significant portion of our revenue and cash flows from sales of subscriptions to our products.  As such, our business depends on our ability to attract new customers and to maintain and expand our relationships with our existing customers, including by expanding their usage and upselling additional solutions.  Our business is largely subscription-based, and customers are not obligated to and may not renew their subscriptions after their existing subscriptions expire.  **As a result, customers may not renew their subscriptions at the same rate, increase their usage of our solutions or purchase subscriptions for additional solutions, if they renew at all.  Renewals of subscriptions may decline or fluctuate because of several factors, such as dissatisfaction with our solutions or support, a customer no longer having a need for our solutions or the perception that competitive products provide better or less expensive options.**  In order to grow our business, we must continually add new customers and replace customers who choose not to continue to use our platform. Any decrease in user satisfaction with our solutions or support may result in negative online customer reviews and decreased word-of-mouth referrals, which would harm our brand and our ability to grow." ER-64 (¶183).

Plaintiff alleged that these six statements were misleading because they omitted the fact that during the pandemic ON24 had signed up a huge wave of new customers, composing small- and medium-sized businesses, for one-year contracts, and those customers planned to either not renew or downsell at the end of their contract terms.  ER-24 (¶9).  Plaintiff asserted that ON24 faced—yet failed to disclose—material customer churn and downselling at the time of the IPO, as well as inevitable weaker financial results in 2021.  ER-24 (¶10).

### 2. *The district court dismisses plaintiff's initial complaint as implausible*

The district court granted defendants' motion to dismiss. The court concluded that, for plaintiff's misleading-omissions theory to be plausible, it must have adequately alleged that ON24 faced material customer churn at the time of the IPO.

Plaintiff attempted to satisfy this burden by pointing to statements from five confidential witnesses, all former employees of ON24, in the complaint. The district court carefully reviewed those statements and concluded all were deficient. ER-99–101. The court explained that vague allegations of "high churn," a "dramatic decline in demand," and that "things really dropped off" were nothing but "bald allegations" absent "some quantification to put them into context." ER-100. Thus, they failed to "provide a factual foundation" for plaintiff's "theory that demand for ON24's products declined to the point that omitting that information materially misled investors." ER-100. And plaintiff's few-and-far-between attempts to provide quantification of existing or imminent churn were similarly insufficient: for instance, an allegation that a former employee noticed "instances" of "40-50% churn of *his* customers" left "unclear … how many customers this one confidential witness had or how many times he saw this degree of churn." ER-100–01.

Independently, the district court ruled that the first three challenged statements were "nonactionable" because they were expressions of corporate optimism that no reasonable investor would rely on. ER-101–03. It also observed that ON24's

metrics confirmed that ON24's statement about ARR growth was "accurate: defendants reported that ARR increased quarter after quarter, including the quarter *after* the IPO." ER-102 (emphasis by court). And while plaintiff protested that some of this growth came from the pandemic, the district court explained that "[i]nvestors can read such numbers and accompanying cautionary language" from ON24 "and judge for themselves the risks." ER-102.

The district court also rejected plaintiff's challenge to the adequacy of ON24's risk disclosures—the second three challenged statements. It observed that under Ninth Circuit precedent, "risk factors are materially misleading only if they failed to warn of risks that had already come to fruition." ER-107. Because plaintiff had failed to plausibly allege that "ON24 faced material customer churn," ER-108, the risk disclosures could not be misleading. Finally, the district court concluded that plaintiff had failed to allege defendants "violated either Item 303 or Item 505 of SEC Regulation[] S-K" for "much the same reason[s]." ER-110. The court granted leave to amend. ER-110.

### 3. *Plaintiff's amended complaint fails to cure its pleading deficiencies*

Plaintiff's amended complaint only compounded the pleading failures the district court had identified. The amended complaint expanded on the statements of one confidential witness and included statements from three new confidential witnesses. But as the district court recognized and plaintiff's counsel admitted

during the hearing on the motion to dismiss, those new assertions were internally inconsistent as well. 1-SER-15 (counsel conceding at hearing that "there are inconsistencies").

The district court dismissed again, this time with prejudice. Plaintiff's theory of liability was that by the time of the IPO, ON24 was either already experiencing, or knew it would encounter, material customer churn. That theory failed for two independent reasons: (1) plaintiff's allegations of whether, when, and how much churn occurred were "internally inconsistent"; and (2) plaintiff's theory was "belied by ON24's actual customer and revenue metrics at the end of 2021." ER-11.

*First*, the district court ruled that the amended complaint was still "impermissibly inconsistent or vague on three" facts critical to plaintiff's theory: "the estimates of how many customers churned; when those customers were alleged to have churned; and whether there was actual turnover or just churn risk." ER-12. Without these facts, plaintiff could not plausibly allege material pre-existing churn, or even material risk of churn, at the time of the IPO. Looking to the new confidential-witness statements, the court observed they "varie[d] wildly" in their account of "how many customers churned." ER-12 (comparing contradictory accounts of percentage of customers that churned). The amended complaint also failed to allege "when ON24 actually experienced this allegedly significant customer churn," precluding the inference that *any* churn pre-dated the IPO. ER-13. Thus,

15

the court concluded, there was "too much inconsistency to demonstrate that ON24 was experiencing actual churn versus a risk of churn in the lead up to the February IPO." ER-13.

***Second***, independent of these inconsistencies, "plaintiff's theory that ON24 was already experiencing, or knew it would encounter, material customer churn by its February 2021 IPO face[d] an even bigger hurdle—it [was] completely contradicted by what actually happened to ON24 in 2021." ER-15. The district court took notice of the undisputed metrics showing that ON24's revenue and customers *grew* from the end of 2020 to the end of 2021, refuting any notion that the company suffered a significant decline in customers during that time. ER-15. Rather, the court reasoned, these numbers compelled the opposite conclusion: ON24 "convince[d] its customers not to cancel their subscriptions after one year." ER-15. It observed that plaintiff's own allegations of ON24's efforts to save at-risk accounts supported that inference. ER-15–16.

The district court then explained that while plaintiff's case was "explicitly hinged on the actual churn or churn risk that allegedly existed at the time of the February 2021 IPO, it also implicitly raise[d] the claim that ON24 misled potential investors by promising that ON24's business would not simply grow post-IPO but continue to grow at the same explosive rate." ER-16. The court rejected that theory for two reasons. First, it reiterated the conclusion from its prior order that ON24's

16

expressions of belief that it could achieve significant future growth "are not actionable promises." ER-16. Second, it concluded that ON24's "detailed disclosures warn[ed] of the very risks that plaintiff claims ON24 failed to disclose." ER-16. Namely, those disclosures explained that "as COVID cooled, [ON24's] customer acquisition and rate of growth might cool as well." ER-17.

The district court also rejected plaintiff's challenges to the adequacy of those risk disclosures. ER-17. It repeated its prior conclusion that without plausible allegations that "ON24 *knew* it faced material customer churn," plaintiff could not show those risk disclosures—which amply described the possibility of future churn as the pandemic lessened—were false or misleading. ER-17 (emphasis added).

Finally, the court rejected plaintiff's reliance on Items 303 and 105 of SEC Regulation S-K, which require disclosures under certain circumstances, for the same reasons. ER-18.

## SUMMARY OF ARGUMENT

The district court correctly ruled that Plaintiff's theory of misleading omissions is squarely foreclosed by ON24's undisputed financial metrics, by plaintiff's own inconsistent allegations, and by ON24's detailed disclosures warning investors of the precise risks plaintiff claims were concealed.

Plaintiff's theory of liability cannot be reconciled with ON24's financial metrics, which are either judicially noticeable or incorporated by reference—

17

including the very offering documents plaintiff challenges. Plaintiff alleges that in 2020, ON24's customer base shifted to new, small- and medium-sized customers with no intention of renewing their one-year subscriptions. But the offering documents show the opposite: that in 2020, the percentage of large enterprises and customers with multi-year subscriptions increased. ON24's annual recurring revenue, which reflects profits from both new and existing customers, increased too. These metrics—the accuracy of which Plaintiff does not challenge—contradict Plaintiff's conclusory allegations, corroborate ON24's challenged statements about its customer base and prior revenue growth, and allowed investors to assess ON24's performance based on objective and verifiable information.

Unsurprisingly, the second part of plaintiff's factual narrative—that ON24 suffered massive churn in late 2020 and early 2021 before the IPO—is similarly contradicted. ON24's revenue and number of customers grew throughout 2021, including year-over-year quarterly revenue growth of 102% and 43% in the two quarters immediately after the IPO. Even assuming some unquantified risk of churn nevertheless existed, the only plausible explanation is one supported by plaintiff's own allegations: ON24 successfully mitigated any risk of non-renewal.

Plaintiff has no meaningful response to these metrics on appeal. It argues only that ON24's 2021 growth fell slightly short of ON24's "prior guidance" and analysts' expectations. But whether ON24 might have missed particular growth

expectations has nothing to do with plaintiff's actual claims: that ON24 purportedly experienced material churn that it knew was coming but failed to disclose. Plaintiff did not bring a guidance claim, and it cannot revise its complaint at this stage to do so. In any event, plaintiff's theory gets the facts wrong: the guidance from ON24 it points to came after the IPO and was not contained in the offering documents.

Plaintiff's theory also falls apart under its own contradictory allegations. The district court rightly concluded that plaintiff's complaint was riddled with internal inconsistencies as to (1) whether ON24 witnessed any significant churn before the IPO, as opposed to a mere risk of churn; and (2) how much churn ON24 purportedly witnessed at any period. To this Court, plaintiff virtually concedes that it failed to plead meaningful pre-IPO churn; its half-hearted arguments to the contrary amount to sheer speculation. Its attempts to reconcile its accounts about the amount of churn improperly introduce new theories for the first time on appeal and repeatedly attempt to rewrite the complaint. The district court did not err in rejecting these implausible allegations.

Thus, as the district court concluded, all plaintiff manages to plead is some unquantified risk of churn after the IPO. But ON24's detailed risk disclosures told investors that this might happen. The company warned that future changes in pandemic-related restrictions could cause customers to not renew their subscriptions, and that this could harm ON24's business. Plaintiff challenges the adequacy of these

disclosures—but its argument boils down to the view that ON24 must have predicted the future of its customers' behavior. That argument contradicts law and logic. Rather, this Court's decisions make clear that ON24 need only have disclosed events that had already occurred.

Plaintiff's remaining arguments on appeal either recycle these failed theories (like its reliance on Regulation S-K to show a Section 11 violation) or assert non-existent error (like its challenge to the standard the district court applied). And because the Section 11 claim fails, the Section 15 claim fails too.

The judgment should be affirmed.

## STANDARD OF REVIEW

This Court reviews the dismissal of plaintiff's claims de novo. *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 875 (9th Cir. 2012). "To avoid dismissal, the complaint must provide 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In meeting this standard, a plaintiff may not rely on "conclusory" and speculative allegations, *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015), nor on internally inconsistent allegations, *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 999 & n.8 (9th Cir. 2014). Indeed, "a plaintiff may plead herself out of court" if "the pleadings establish facts compelling a decision one way."

*Weisbuch v. Cnty. of L.A.*, 119 F.3d 778, 783 n.1 (9th Cir. 1997) (citation omitted).

Finally, the Court need not "accept as true allegations that contradict matters

properly subject to judicial notice." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049,

1055 (9th Cir. 2008).

## ARGUMENT

## I.   THE DISTRICT COURT CORRECTLY RULED THAT PLAINTIFF'S SECTION 11 CLAIM FAILS BECAUSE IT HAS NOT ADEQUATELY ALLEGED A MATERIAL MISREPRESENTATION OR OMISSION

To plead a Section 11 violation, plaintiff must plausibly allege that ON24's

offering documents contained a material misrepresentation or omission. *In re Rigel*,

697 F.3d at 885 & n.14. Plaintiff does not contend that any challenged statement

contains an actual falsehood, and instead proceeds solely on the theory that the

offering documents failed to disclose other facts necessary to make the challenged

statements not misleading. To be actionable, that type of omission must

"affirmatively create an impression of a state of affairs that differs in a material way

from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d

997, 1006 (9th Cir. 2002). The requirement that any such difference be "material"

means that "there must be a substantial likelihood that the disclosure of the omitted

fact would have been viewed by the reasonable investor as having significantly

altered the total mix of information made available." *Basic Inc. v. Levinson*, 485

U.S. 224, 231–32 (1988) (quotation marks and citation omitted).

Plaintiff contends that all six challenged statements are misleading for the same reason. It alleges that when the COVID-19 pandemic began, ON24 started signing on a far greater number of "atypical" customers: that is, small- to medium-sized businesses that ON24 knew would not renew their contracts. ER-24 (¶9). Plaintiff asserts this shift resulted in a wave of non-renewals, or churn, that began before the February 3, 2021 IPO and that would continue throughout 2021. ER-24 (¶10). According to plaintiff, ON24 violated Section 11 by failing to disclose this customer shift and the material churn that would result. As the district court concluded, that theory fails for multiple independent reasons.

## A. The District Court Correctly Concluded That Plaintiff's Omissions Theory Is Fatally Contradicted By ON24's Undisputed Financial Metrics

### 1. ON24's undisputed 2020 and 2021 metrics foreclose plaintiff's theories of customer shift and material churn

The district court correctly concluded that plaintiff's theory of liability is "completely contradicted by" other statements in ON24's offering documents and ON24's financial metrics, which are largely in the complaint and otherwise incorporated by reference or judicially noticeable—and the accuracy of which are not challenged by plaintiff. ER-15; *see In re Gilead*, 536 F.3d at 1055 (plaintiff's

theory need not be accepted as true when contradicted by judicially noticed documents).

Rather than challenge these metrics, plaintiff challenges as misleading ON24's statements (1) that it had a "highly engaged and loyal customer base that" allowed it to "grow [its] revenue with them over time"; (2) that its ARR growth, including during the pandemic, reflected "success in acquiring new customers and expanding subscriptions with existing customers"; and (3) that ON24 had reason to "believe" it could achieve further growth and sales in the future. ER-57–61 (¶¶175, 177, 179). Plaintiff also challenges ON24's detailed risk disclosures explaining that pandemic-related changes could affect demand for its products and resulting revenues. ER-63–64 (¶¶181-83). Plaintiff's theory that these statements all contained misleading omissions has two steps: first, that the 2020 growth in ON24's customer base was driven predominantly by an increase in new, small businesses who signed one-year contracts; second, that this shift produced material customer churn in late 2020 and early 2021 that ON24 knew of yet failed to disclose.

The first assumption in plaintiff's theory is refuted by the very offering documents plaintiff challenges. Between December 31, 2019 and September 30, 2020, the number of customers contributing at least $100,000 of ARR—which are, again, "generally large organizations"—shot up from 144 to 271. 1-SER-59, 69, 111–12. As of 2020, those large organizations represented 66% of the company's

total ARR. 1-SER-69. The number of customers with multi-year subscriptions similarly increased, from 21% at the end of 2018 to 27% as to September 30, 2020. 1-SER-108. So too did the percentage of "customers with subscriptions to two or more experience products," from 17% at the end of 2019 to 29% as of September 30, 2020. 1-SER-108. Consistent with these statistics (which plaintiff does not challenge), ON24's revenue rates from 2020 show growth from new *and* existing customers: its NRR increased by 39% and its ARR increased from $76.9 million to $138.9 million. ER-23 (¶7); ER-37 (¶¶71–72). Those metrics do not refute, but rather *corroborate* ON24's statements about its customer base, its historic growth, and its optimistic views of future opportunities. ER-57–61 (¶¶175, 177, 179).

ON24's financial metrics also foreclose plaintiff's second, key allegation: that ON24 experienced material churn from purportedly "atypical" customers. According to plaintiff, ON24 faced churn in early 2021 at rates of 40%, 50%, or even 80%. *E.g.*, ER-26 (¶¶14, 16); *but see infra* pp. 36-44 (explaining fatal inconsistencies in these allegations). If so, ON24 would have experienced a massive decline in customers during and after that period and a corresponding decline in revenue. But the numbers show the opposite: ON24's customer base and revenue *grew* in 2021 by almost every metric. By the end of that year, ON24's year-over-year revenue had increased by 30%. 2-SER-384. What's more, ON24's overall growth came in part from *new* customers, further refuting plaintiff's assertions of

24

customer loss. As the district court observed (ER-15), ON24's total number of customers increased to 2,122 by the end of 2021. 2-SER-379. Finally, ON24's ARR similarly grew during each quarter of 2021, resulting in a 30% year-over-year increase in annual revenue. 1-SER-274, 278; 2-SER-289, 295; 2-SER-306, 312, 322; 2-SER-323, 329; 2-SER-379, 384. Indeed, ON24's 2021 revenue increase included a 43% increase in subscription revenue specifically—the subject of plaintiff's churn allegations. 2-SER-384.

Rule 8 does not permit plaintiffs to proceed on factual theories that simply cannot be reconciled with uncontested metrics stated in incorporated or judicially noticeable documents. *E.g.*, *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998) (affirming dismissal of Section 11 claim where "uncontested" historical sales and revenue data refuted plaintiff's theory that defendant knew of impending financial issues); *Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014) (dismissing False Claims Act complaint when plaintiff's allegation that defendant "knowingly submitted false claims for reimbursement is compellingly contradicted by a series of letters he attached to his complaint"). This Court may reject plaintiff's claims on this ground alone.

### 2. *Plaintiff's attempts to reconcile its theory with these metrics fail*

#### a. *None of plaintiff's arguments suggests its churn theory is factually possible in light of ON24's financial metrics*

On appeal, plaintiff can show no error on this ground. It has no explanation for the uncontested facts about ON24's 2020 customer base and revenue sources. Nor does it have a colorable explanation for ON24's 2021 success. It instead misrepresents certain 2021 metrics, like by noting that the company "reported a 2021 Q2 loss of 167 customers." Opening Br. 38. But the company also *gained* 183 customers that same quarter, resulting in a net increase. ER-71 (¶203). Things get worse for plaintiff the more numbers it throws up, such as ON24's supposed loss of just 24 customers in Q3 2021. Opening Br. 38. Again, ON24's total customer count that quarter was 2,054—higher than the 1,918 total disclosed in the offering documents and 7% more than the same quarter the prior year. ER-73–74 (¶¶212, 214). In short, these figures are impossible to square with plaintiff's account of 40%, 50%, or even 80% churn. Unless plaintiff's Section 11 theory is that ON24 is liable if it lost *any* customers (a theory that would not, in any event, support liability based on what the offering documents disclosed), these figures offer no help to plaintiff.

Plaintiff nonetheless argues that its theory of material churn is factually reconcilable with the metrics because ON24's 2021 growth was "weaker than expected" as compared to "analysts' consensus expectations and/or ON24's prior guidance." Opening Br. 38–40 (recounting analyst statements). But that answer is

untethered from plaintiff's theory of liability. Whether ON24's 2021 revenue was greater or weaker than its or analysts' expectations has nothing to do with whether the company knew about, but failed to disclose, material churn. To put it differently, the offering documents did not contain any forecasts or financial guidance for these periods and plaintiff did not bring a guidance-related claim; in fact, it has disclaimed that notion, arguing that "[n]owhere does Plaintiff allege that Defendants promised 'explosive' post-IPO growth." Opening Br. 42.

Regardless, there is no support for plaintiff's revised theory. First off, plaintiff's new guidance theory falls apart on the uncontested documents. Far from offering "guidance" on its upcoming revenue, ON24's offering documents did the opposite: ON24 expressly warned investors that "[a]s a result of our limited operating history at our current scale, our ability to forecast our future results of operations is limited and subject to a number of uncertainties" and investors thus "should not rely on our recent revenue growth rate or the revenue growth rate of any prior quarterly or annual period as an indication of our future performance." 1-SER-61. Plaintiff nonetheless alludes to "[p]rior [g]uidance" (Opening Br. 39 (citing ER-68–69 (¶194))), but ON24 disclosed that "guidance" in a May 2021 filing, three months after the IPO. 1-SER-271–75; *see* 15 U.S.C. § 77k (misleading statement or omission must be in "the registration statement"). In addition, the fact that ON24 lowered its guidance for fiscal year 2021 revenues six months after the

IPO says nothing about what actually happened before the IPO, much less in a way that might cast doubt on the actual 2021 metrics ON24 provided. Indeed, plaintiff never provides ON24's actual 2021 revenues at all—merely its *projected* revenues. ER-68–69 (¶194). It thus has no support for its assertion that the company's 2021 revenues were "weaker" than anything. *Contra* Opening Br. 38.

Finally, plaintiff points to two statements by ON24's leadership during an earnings call observing that, despite ON24's best efforts, some customers ultimately did not renew their subscriptions. Opening Br. 40–41 (citing ER-76 (¶¶221, 224)). But these statements were made a year after the IPO. They cannot support plaintiff's theory that ON24 experienced churn before the IPO or that any churn was close to the amount plaintiff alleges—much less that ON24 knew such churn was certain at the time of the IPO. *See Yourish v. Cal. Amplifier*, 191 F.3d 983, 996 (9th Cir. 1999) (a later statement establishes falsity of a prior statement only when it indicates the speaker "knew it all along").

> **b.** ***Given this factual impossibility, plaintiff has also failed to establish a plausible inference that ON24 experienced material churn***

ON24's undisputed financial metrics also demonstrate that plaintiff's allegations cannot satisfy the plausibility threshold this Court has consistently enforced. Plaintiffs cannot survive dismissal by offering allegations that are "consistent with" an "alternative explanation" that shows no liability. *In re Century*

*Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  In *Eclectic Properties, East, LLC v. Marcus & Millichap Co.*, for example, plaintiff alleged defendant sold it property for $30 million that was worth only $11 million.  751 F.3d at 998.  While that increase in price might have been consistent with fraudulent intent, it was equally consistent with an innocent explanation from "Plaintiffs' own complaint":  "that long-term commercial real estate leases typically support future property sales at a multiple of the actual market value." *Id.* (quotation marks omitted).  That innocent explanation was further supported by the "common sense" proposition that "real estate values can be variable," and by allegations that "undermine[d]" plaintiff's theory that the property was worth just $11 million. *Id.* at 998–99.  The Court thus dismissed plaintiffs' complaint as implausible.

That conclusion applies with even greater force here.  ON24's financial metrics show not just an "obvious alternative explanation" inconsistent with liability, but the only possible explanation:  ON24 recognized the risks associated with its growth related to COVID-19, disclosed those risks in the offering documents, and then worked successfully to mitigate that risk.  As plaintiff's own allegations demonstrate, ON24 identified accounts at risk of churn during its monthly meetings and discussed "potential ways to keep the customer on board" and "retain their business."  ER-51–52 (¶154).  Moreover, employees were required to

"include[] notes in Salesforce as to … what was being done to save [an] account" at risk of non-renewal. ER-56 (¶172). The district court correctly recognized that these allegations compelled a single explanation: ON24 realized a risk that some of its 2020 customers might not renew, worked diligently to address that risk, acknowledged it to investors, and ultimately "convince[d] its customers not to cancel their subscriptions after one year." ER-15–16.

Plaintiff has, again, no response to the innocent explanation compelled by these alleged facts. At most, it argues "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, *both of which are plausible*, plaintiff's complaint survives a motion to dismiss." Opening Br. 32 (quoting *Eclectic Props.*, 751 F.3d at 996) (emphasis added). Even assuming plaintiff's explanation is possible (*but see supra* pp. 22-28), plaintiff overlooks the pre-requisite to that statement: that both explanations must be *plausible*. And as *Eclectic Properties* explains just a few sentences later, when there are only "two possible explanations … [s]omething more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, in order to render plaintiffs' allegations plausible." 751 F.3d at 996–97. Yet in two complaints, two rounds of dismissal briefing, and an appeal brief, plaintiff has failed to offer that "something more." Nor can they, given ON24's uncontested financial metrics.

30

**B.      The District Court Correctly Concluded That Plaintiff's Allegations Are Implausible On Their Own Terms**

Even if this Court disagrees that ON24's unchallenged financial metrics alone make plaintiff's complaint implausible, the pervasive inconsistencies and ambiguities in plaintiff's allegations compel the same result.

When a "complaint is self-contradictory" as to an essential element of a claim, "[t]he pleader has created an ambiguity fatal to his claim." *New v. Armour Pharm. Co.*, 67 F.3d 716, 722 (9th Cir. 1995), *overruled on state law grounds by Norgart v. Upjohn Co.*, 21 Cal.4th 383 (1999); *accord*, *e.g.*, *Orellana v. Mayorkas*, 6 F.4th 1034, 1043 (9th Cir. 2021) ("internally inconsistent" allegations render a complaint implausible) (citing *Eclectic Props.*, 751 F.3d at 999 & n.8).  In *New*, the relevant limitations period required a plaintiff to bring suit within a year of discovering his injury.  The complaint, however, alleged simultaneously that (1) the injury occurred within a year of filing his complaint and (2) that the injury occurred over a year before filing.  67 F.3d at 722.  Even though the complaint would be timely based on some of the allegations, the Court held that the complaint was "self-contradictory" and could not establish a timely complaint.  *Id.*; *see Eclectic Props.*, 751 F.3d at 999 (plaintiff's drastically inconsistent allegations about the value of a property—$11.1 million and $20.3 million—meant the Court could not accept as true either allegation regarding the property's actual value and thus rejected plaintiff's fraud theory).

So too here. The district court carefully considered the allegations in plaintiff's amended complaint and determined that they were "impermissibly inconsistent or vague" as to "the estimates of how many customers churned; when those customers were alleged to have churned; and whether there was actual turnover or just churn risk." ER-12. On appeal, plaintiff offers no basis to disturb those conclusions.

### 1. Plaintiff's internally inconsistent allegations that material churn occurred before the IPO, as opposed to mere churn risk, cannot be accepted as true

The district court correctly concluded that "at least a part of plaintiff's theory of the case" is "implausible" because plaintiff fails to allege "that *any* of" the allegedly atypical "customers actually churned in 2020" before the IPO, as opposed to presenting a mere "risk" of later churn. ER-14.

The core of plaintiff's Section 11 claim is that ON24 failed to disclose that it was already experiencing material churn at the time of the IPO. *E.g.*, ER-61 (¶178) ("ON24 began experiencing a material decline in demand in the fourth quarter of 2020 and first quarter of 2021 … and which continue[d] through and after the IPO."). But as the district court explained, plaintiff's vague descriptions of "instances" of churn at an unspecified time, of a "risk" of churn, and of customers telling ON24 that they "planned" not to renew fail to support that assertion. ER-13; *see, e.g.*, ER-

26, 28, 42, 53 (¶¶16, 23, 102, 160).  In fact, plaintiff has affirmatively pleaded itself "out of court" on this issue.  *Weisbuch*, 119 F.3d at 783 n.1.

Plaintiff repeatedly asserts that the wave of "atypical" one-year contracts from small- and medium-sized businesses began in March 2020 and continued throughout the summer.  *E.g.*, ER-24, 26, 42, 51, 52 (¶¶9, 14, 103, 150, 158).  Other allegations assert that ON24 did not begin signing atypical customers until much later, in November of 2020.  *E.g.*, ER-45–46 (¶121).  Whether those atypical contracts began in March 2020 or November 2020, none of them could have been up for renewal before the February 3, 2021 IPO.  ER-13 (district court reasoning similarly).  Furthermore, the unchallenged reported financial results show revenue *growth* from new and existing customers during the period immediately before the IPO—not churn.  1-SER-260; ER-23 (¶7); ER-37 (¶¶71–72); *supra* pp. 4-6, 8, 23-25.  Plaintiff's allegation that churn occurred before the IPO "is thus implausible in the face of contradictory … facts alleged in [its] complaint." *Somers v. Apple, Inc.*, 729 F.3d 953, 964 (9th Cir. 2013).  That forecloses plaintiff's theory that any offering document statement was misleading on this basis.  This conclusion is only reinforced when assessing plaintiff's challenges "in light of all [the] surrounding text" in the offering documents and incorporated filings, including the metrics of ON24's 2020 and 2021 growth.  *Omnicare*, 575 U.S. at 190; *see supra* pp. 4-6, 8, 23-25 (showing overall growth in customers in 2020 and 2021).

Plaintiff's attempts to avoid this result fail. It invokes a passing allegation from one former employee that, of his 25 to 30 "atypical" customers (most of whom purportedly churned), a "handful" had six-month contracts instead of one-year ones. Opening Br. 18, 27; *see* ER-53 (¶161). That allegation cannot save plaintiff for several reasons. First, without any details suggesting that those contracts actually came up for renewal before the IPO—much less whether or not they actually renewed—this allegation fails to establish that ON24 "create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Brody*, 280 F.3d at 1006. Second and relatedly, Plaintiff ignores that the complaint has no other allegations of six-month contracts. To the contrary, it expressly states that ON24's contracts were typically for a year. ER-35 (¶64). Third, this statement is part of a churn estimate that the district court deemed inconsistent with other churn estimates from the same former employee, which makes it implausible for that reason alone. *See infra* pp. 41-42. Finally, a handful of six-month contracts out of 25 to 30 atypical contracts would be a single-digit number of contracts—far from material churn for a company of nearly 2,000 customers.

Plaintiff also posits that one former employee's "customers could have had 'single event' based deals with subscriptions for less than one-year." Opening Br. 29 n.5. But no factual allegations support that impermissible speculation. *Omnicare*, 575 U.S. at 194. The paragraph of the complaint plaintiff cites does not

actually say that single-event deals could carry subscriptions of under one year. ER-41 (¶99). The complaint actually alleges the opposite: that "there were customers who only wanted to utilize ON24 for a single event: 'quick fix' customers *who would still require a one-year subscription*." ER-45 (¶120) (emphasis added).

Ultimately, plaintiff hardly defends this core aspect of its theory, but instead contends its failure to allege pre-IPO churn is of no moment because it "need only plausibly allege that the risk of churn had materialized at the time of the IPO." Opening Br. 37. But that is a belated attempt to walk away from the actual narrative of the complaint: a wave of churn that started before the IPO. *E.g.*, ER-58 (¶176) (asserting that "atypical subscriptions began to churn prior to the IPO" and describing "material churn … that had occurred prior to the IPO and was knowingly going to continue"). Even assuming plaintiff's theory can be generously read in the manner plaintiff now urges, it is once again foreclosed by the offering documents. *Omnicare*, 575 U.S. at 190 (determining whether statements are misleading requires reviewing them in "context" of other disclosures, including "any other hedges, disclaimers, or qualifications"). Those detailed disclosures warned that "as COVID cooled, [ON24's] customer acquisition and rate of growth might cool as well." ER-16–17; *see* ER-63–64 (¶¶181-83). And as discussed below, plaintiff's challenges to those risk disclosures fail. *Infra* pp. 47-53.

### 2.    *Plaintiff's internally inconsistent allegations that the quantity of churn was material cannot be accepted as true*

The district court also correctly concluded that the complaint is deficient as to another essential element of plaintiff's theory:  the amount of churn ON24 purportedly witnessed.  In its first dismissal order, the district court ruled that the original complaint's allegations of churn were too vague to satisfy Rule 8 and that some "quantification" of churn was required.  ER-100.  Plaintiff attempted to satisfy that requirement by providing purported churn estimates from three confidential witnesses:  Former Employee 2 ("FE2"), Former Employee 7 ("FE7"), and Former Employee 8 ("FE8").  ER-26–28 (¶¶14, 19, 21).  On appeal, it does not challenge the district court's conclusion that some quantification was required, nor does it argue that any of the other five witnesses provided that quantification.

Plaintiff's reliance on these three witnesses cannot save its complaint.  As the district court concluded, all three witnesses' estimates are plagued with internal inconsistencies and ambiguities, making it impossible to infer material churn.  ER-12–14.  Exacerbating those inconsistencies, plaintiff "never attempt[s] to estimate the number of atypical customers *throughout the company*" who purportedly were more susceptible to churn.  ER-14 (emphasis added).  In fact, the complaint precludes the notion that any former employee's experience might be representative of what ON24 was experiencing because their accounts contradicted

not only themselves but each others'—not to mention ON24's undisputed financial results. ER-12–13.

Nor does plaintiff even dispute that some of these inconsistencies exist. Despite being given repeated opportunities by the district court, plaintiff's counsel could not reconcile a host of contradictory statements, 1-SER-12–16, ultimately admitting that "there are inconsistencies." 1-SER-15. Given these concessions, plaintiff has affirmatively waived, or at least forfeited, any argument that the district court erred in deeming those allegations inconsistent. *E.g.*, *Ramsey v. Kantor*, 96 F.3d 434, 445 (9th Cir. 1996) (concession at oral argument "effectively waiv[ed]" challenge); *accord CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 850 (9th Cir. 2019) (concession of argument in district court waives it on appeal).

Plaintiff tries to avoid the effect of these concessions by insisting this Court can sever the concededly inconsistent statements and consider what's left (and that the district court should have done the same). Opening Br. 35 n.8. But no law supports such an approach. Indeed, in the sole decision plaintiff cites, this Court merely concluded that a corporate employee would have had sufficient personal knowledge about an event even if his "estimates might not be 100% perfect." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 772 (9th Cir. 2023). *Glazer* says nothing about how to handle internally inconsistent allegations in a complaint. ER-15 (district court reasoning similarly). And it certainly does not disturb the

principle that internal inconsistencies about a key allegation make a complaint implausible. *New*, 67 F.3d at 722; *Orellana*, 6 F.4th at 1043; *Eclectic Props.*, 751 F.3d at 999 & n.8.

Finally, none of plaintiff's arguments about FE2, FE7, and FE8 make those witnesses' accounts any less inconsistent, either with themselves or with the financial metrics incorporated into plaintiff's complaint:

***FE2.*** Plaintiff seeks to use FE2's allegations to establish that 10% of ON24's existing customers churned. Opening Br. 29; *but see supra* pp. 4-6, 23-25 (showing increase in number of customers in both 2020 and 2021). It cannot do so because FE2 provides irreconcilable accounts of the amount of churn he witnessed. First, FE2 asserts that "throughout 2020 … there were *instances* that he would notice 40-50% churn among his customers" who viewed ON24's services as a mere "COVID related expense," ER-42 (¶102) (emphasis added)—a vague statement from which plaintiff impermissibly speculates that FE2's entire cohort of customers churned at that rate. ER-43 (¶106). Second, FE2 inexplicably doubles that number, stating that 80% of his new customers told him they did not plan to renew their contracts. ER-26 (¶16); *see* ER-12 (district court describing these competing figures). Finally, FE2 asserts that only "several" of his customers a month presented churn risk. ER-42 (¶104). But as plaintiff now concedes on appeal, that would not come close to the 80% churn he previously described—nor does it bear any apparent relationship

to the 40-50% churn either. ER-12 (district court noting that this last estimate would result in even fewer churning customers); Opening Br. 35 n.8 (conceding that the "several" estimate "would not add up to 80% of [FE2's] new customers").

Those inconsistencies are exacerbated by the contradictions as to how many new customers FE2 had overall in 2020. At one point, he purportedly signed three to five contracts a day. ER-42 (¶104). That would result in over a thousand customers annually, more than half of ON24's total customer base. Yet FE2 elsewhere asserts he *plus his team* had only about 25% of ON24's total business. ER-42(¶¶102–03). At the motion to dismiss hearing, plaintiff conceded this inconsistency too and admitted that FE2 had just "100 to 150 customers," not the "thousands" his other allegations implied. 1-SER-14; *see Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1117 (9th Cir. 2018) (court may consider whether allegations "have since been conclusively contradicted by plaintiffs' concessions") (citation omitted). Plaintiff thus agreed that even assuming 80% of FE2's customers churned—the highest rate alleged, and a rate plaintiff now concedes should be disregarded (Opening Br. 35. n.8)—that would mean that only "80 out of 1,900 customers" potentially failed to renew. 1-SER-14. That number, of course, is even smaller if FE2's 40–50% churn rate is used instead. Thus, even were the Court somehow to reconcile these wildly varying statements in the manner plaintiff urges, that would at best result in a degree of churn that is far too small to "hav[e] significantly altered

the total mix of information made available." *Basic*, 485 U.S. at 231–32 (quotation marks omitted).

On appeal, plaintiff tries to backtrack from its counsel's concession by stating that the 60-to-100-per-month/three-to-five per day figure represents new contracts instead of new customers and speculates that many of FE2's new customers had multiple contracts. Opening Br. 34–35. Yet despite two complaints, two rounds of briefing, and a hearing in which FE2's statements were challenged by defendants and the district court, plaintiff never raised this argument "sufficiently for the trial court to rule on it," so it is "waived." *Armstrong v. Brown*, 768 F.3d 975, 981 (9th Cir. 2014). Regardless, that belated explanation creates more problems than it solves. First, the idea that FE2's 100–150 new customers each had a multitude of contracts contradicts the core premise of plaintiff's complaint: that the "atypical" pandemic-era customers were seeking "quick fix," "single event" deals with ON24. *E.g.*, ER-41, 45, 57–58 (¶¶99, 120, 176). Second, that explanation still results in a mere 80 customers out of over 1,900, hardly material. Third, it injects yet another fatal ambiguity into FE2's allegations: whether any given churn quantity he reported refers to individual contracts or to entire customers.

Plaintiff's other attempts to reconcile FE2's statements resort to misdirection. Plaintiff argues that the 80% churn rate was limited to FE2's new customers, while the 40% to 50% churn rate included FE2's "existing" customers who had used ON24

before the pandemic. Opening Br. 34. But the complaint repeatedly contradicts that new spin. In FE2's own words, those "40-50%" of customers were new ones—those who had "signed on throughout 2020." ER-43 (¶107). Similarly, FE2 states that the cohort among which he noticed "instances" of "40-50% churn" were those customers who explained that ON24 "was simply a COVID related expense." ER-42 (¶102). That is a statement that only new customers would make. Were that not enough, plaintiff's counsel provided the exact *opposite* explanation at the dismissal hearing, characterizing the 80% figure as applying to "a greater time period" that encompassed "all the customers" FE2 had. 1-SER-12.

*FE7.* Plaintiff's reliance on FE7 fares no better, as the district court recognized. To start, many of FE7's assertions are impermissibly vague and conclusory, such as his statement that ON24 was signing "a ton" of atypical customers. ER-27 (¶19); *see Macomb Cnty. Emps. Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1097–99 (9th Cir. 2022) (descriptions of "huge" opportunity are "vague"). While plaintiff continues to invoke those statements (Opening Br. 30), it never challenges the district court's prior conclusion that such descriptions are impermissibly vague (ER-100).

In the few instances that FE7 provides actual numbers, they cannot be reconciled. As the district court observed, some of his statements allege an 80% churn rate, while others allege 30%. ER-12; ER-53 (¶161). But FE7 also says that

just 20% of his customers were a high churn *risk* for 2021. ER-13; ER-53 (¶160). Even if these figures could somehow be reconciled, they are immaterially small: plaintiff conceded at the dismissal hearing that just 24 of FE7's customers allegedly churned, out of nearly 2,000 customers company wide. 1-SER-14; *see Hicks*, 897 F.3d at 1117 (court considers concessions that cut against complaint allegations).

For the first time, plaintiff tries to reconcile these numbers. It argues that the 80% figure "pertains to FE7's team, whereas the 30% churn rate pertains to FE7's customers alone." Opening Br. 36. Not only do no allegations support these new assertions, but plaintiff forfeited this argument by failing to make it to the district court. *Armstrong*, 768 F.3d at 981. And plaintiff's new unpled theory simply confirms the insurmountable nature of the inconsistencies in the complaint: if FE7's new customers churned at less than half the rate of his team, it is impossible to extrapolate from these varying figures what ON24's company-wide churn rate was.

**FE8.** Finally, the district court correctly deemed FE8's attempts to quantify churn implausible for a simple reason: FE8 left ON24 before any of his contracts came up for renewal, which makes his predictions about actual churn at most speculative. ER-54–56 (¶¶164–70); *see* ER-13. Plaintiff now contends that some of FE8's accounts "did" churn in 2020. Opening Br. 30. That misstates the complaint. FE8 never stated that any of his customers failed to renew; the complaint

states only that some of his accounts were "going to churn" or were "likely to churn." ER-55 (¶168).

Setting that aside, FE8's statements are fatally inconsistent too. As the district court recognized, FE8's estimates of churn risk vary wildly, from 43%, to 50%, to 70%. ER-55–56 (¶¶168–70); ER-14 (district court observing same). Plaintiff responds that these figures are consistent because they describe three different cohorts: "overall customer base," "new customers," and "customers that added the Hub Experience." Opening Br. 36. Of course, plaintiff never offered this explanation to the district court. For good reason: it requires an interpretation that crosses the line from a generous reading of the complaint to a fantastical one. The 43% and 50% figures are describing the same cohort: "accounts from 2020," or "new accounts." ER-55 (¶168). Further, while the complaint vaguely states that Hub Experience customers were "especially" unlikely to renew, the 70% figure is alluded to in a following sentence, and describes what FE8 purportedly saw when he was "reviewing his book" as a whole—not a specific sub-group of accounts. ER-55–56 (¶170).

Finally, plaintiff attempts to defend the inconsistencies not just within, but among, the FEs' statements. According to plaintiff, such inconsistency is permissible because each FE "had their own unique customer base." Opening Br.

36–37.  But that just reinforces the court's conclusion that plaintiff does not even *attempt* to estimate company-wide churn.  ER-14.

***

Despite its lengthy attempts to reconcile its witnesses' internally contradictory accounts, plaintiff fails to do so.  And plaintiff never even tries to tether those allegations to ON24's reported 2020 and 2021 growth.  This Court may affirm on that ground as well.

### C.  The District Court Correctly Concluded In Its First Dismissal Order That Three Of The Challenged Statements (Statements 1–3) Are Non-Actionable Expressions Of Corporate Optimism

The first three challenged statements cannot be false or misleading for an independent reason:  they are non-actionable expressions of corporate optimism.  The district court's first dismissal order rejected plaintiff's challenges to these statements on this ground (ER-101–05) and the court repeated some of that reasoning in its second order (ER-17).  The Court may affirm on that basis as well.  *Sully v. Ayers*, 725 F.3d 1057, 1067 (9th Cir. 2013) (court may affirm on any ground supported by the record).

This Court and the Supreme Court have consistently held that "feel-good" statements of corporate optimism are not actionable under the securities laws.  This Court reached this conclusion because "professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives."  *In*

44

*re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010); *accord, e.g.*, *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014)99. Indeed, these kinds of "vague" and subjective expressions of "opinion" are "not capable of objective verification" at all. *Macomb*, 39 F.4th at 1097–99; *accord Omnicare*, 575 U.S. at 184 (distinguishing between "mere puffery" and "a determinate, verifiable statement"). Thus, a company's boasts of "sound" credit quality, "superior" credit metrics, and "strong credit culture" are inactionable as "vague, optimistic statements." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1206–07 (9th Cir. 2016). Similarly, characterizing a market as "really good" is plain "puffery" on which investors cannot rely. *Macomb*, 39 F.4th at 1097–99.

The first three challenged statements are the same type of non-actionable optimism. Take ON24's description of a "highly engaged and loyal" customer base. ER-57 (¶175). That statement is the paradigm of a vague, feel-good statement that no reasonable investor would rely on—after all, there is no verifiable way to measure engagement and loyalty. Equally nonactionable is the second challenged statement: that ON24's "consistent ARR growth each quarter reflects [its] success in acquiring new customers and expanding subscriptions with existing customers, which was occurring prior to the COVID-19 pandemic and has accelerated in 2020 partly in response to the COVID-19 pandemic." ER-59 (¶177); *see In re Syntex Corp. Sec.*

*Litig.*, 95 F.3d 922, 931 (9th Cir. 1996) (statements that company is "doing well" and had a "great future" nonactionable expression of optimism).

Finally, plaintiff challenges ON24's statement that "[w]e *believe* we can achieve significant growth by retaining and further penetrating our existing customer base with the addition of new users and new products, and through upsell and cross sell," and "we *believe* that we have a significant opportunity to further increase sales among existing customers across different functional and geographic departments within each respective organization."  ER-61 (¶179) (emphasis added).  But these predictions of "significant growth" and a "significant opportunity to further increase sales" are too vague to have any potential to mislead.  *See Police Ret. Sys.*, 759 F.3d at 1060 (statements that an opportunity "is still very, very large" and that "there is potential for growth" were inactionable).

This final statement is inactionable for yet another reason:  a "sincere statement of pure opinion is not an untrue statement of material fact, regardless whether an investor can ultimately prove the belief wrong."  *Omnicare*, 575 U.S. at 186 (quotation marks omitted).  That extends to situations "when an issuer knows, but fails to disclose, some fact cutting the other way" of its expressed opinion.  *Id.* at 189.  The Court reiterated that this principle recognizes that a "[r]easonable investor[] understand[s] that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a

statement as an opinion, thus conveying uncertainty." *Id.* at 189–90.  For instance, a statement that an issuer believes in a particular practice's legality is not false or misleading simply because one of multiple lawyers expressed doubts about that legality, when others opined otherwise.  *Id.* at 190.

Thus, even if ON24 was aware of facts suggesting a risk of churn, that does not render misleading its stated belief that it could overcome that risk and achieve further growth—a belief that, again, plaintiff's own allegations support and that turned out to be right.   ER-51–52, 56 (¶¶154, 172) (discussing ON24's efforts to mitigate churn risk); *supra* pp. 8, 23-25 (discussing ON24's 2021 success).  Nor can plaintiff prevail on the narrow exception to that rule by contending ON24's beliefs were not honestly held at the time.   Plaintiff affirmatively disclaimed any such argument because its complaint explicitly "disclaims any allegations of scienter or fraudulent intent." ER-81 (¶243); *see Omnicare*, 575 U.S. at 186 (same disclaimers in complaint precluded plaintiff from alleging that statement of belief was false or misleading).

### D.   ON24's Risk Disclosures (Challenged Statements 4–6) Were Adequate

In addition to the fatal flaws in plaintiff's entire theory of liability discussed above, plaintiff's complaint that ON24's risk disclosures (challenged statements 4–6) were misleading fails for an additional reason.  Plaintiff contends that ON24's

risk disclosures improperly framed the risk of churn as a possibility, not a certainty. But under this Court's precedent, ON24 disclosed all it needed to.

In assessing the scope of an issuer's risk-disclosure obligation, this Court has explained that a company need not predict future events or provide warnings about events outside its control. *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1406–07 (9th Cir. 1996). In *Stac*, the plaintiffs argued the defendant had failed to adequately warn investors that Microsoft would introduce a competing product. Defendant's offering documents instead explained that Microsoft "has licensed a competitive data compression product" and that "[t]here can be no assurance that Microsoft ... will not incorporate a competitive data compression technology in their products." *Id.* at 1406 (second alteration in original) (emphasis omitted). Plaintiffs argued this disclosure was inadequate because defendant "*knew* that Microsoft was going to come out with a competitive product, but masked this knowledge as a contingency." *Id.* (emphasis in original). This Court squarely rejected that position. Even if Microsoft "had informed" defendant of its intention to release a competing product, defendant "could not have known whether Microsoft would truly do so." *Id.* at 1407. Simply put, another's "plans cannot be known to a certainty." *Id.*

As the district court correctly recognized, the same is true here. ER-107. ON24 disclosed the possibility that third parties—its customers—would take actions that could impact ON24's business. One of the statements plaintiff challenges noted

that "[i]f these new customers elect not to continue their subscriptions as the impact of COVID-19 lessens, our business, financial condition and results of operations would be harmed." ER-63 (¶181). Nothing more was required. Even assuming a material number of customers "had informed" ON24 prior to the IPO that they "planned" not to renew, ON24 "could not have known" what those customers "would truly do." *Stac*, 89 F.3d at 1407. After all, the very reason companies have sales teams is to negotiate with customers who are considering leaving—a reality plaintiff itself acknowledges when describing ON24's work to retain customers at risk of non-renewal. ER-51–52, 56 (¶¶154, 172). Indeed, "experience and common sense" compels the conclusion that neither ON24 nor its customers knew with certainty how COVID-19 restrictions, and resulting demand for ON24's services, would develop by the time these customers' subscriptions came due. *Iqbal*, 556 U.S. at 663–64; ER-14 (district court recognizing "historic uncertainty surrounding the COVID-19 pandemic"). And again, ON24's metrics show that the risk of which it warned did not materialize in the period right after the IPO, contrary to plaintiff's assertions.

None of plaintiff's arguments undermines the district court's conclusion. Despite the district court's heavy reliance on *Stac*, plaintiff addresses that dispositive decision only in a footnote, contending that *Stac* is limited to its specific facts. Opening Br. 48 n.11. Yet nothing in *Stac* suggests that an issuer need not predict

future events regarding "a single competitor's" business but must attempt that prediction for events regarding "an entire cohort of a company's customers." Opening Br. 48 n.11. To the contrary, the Court relied on a series of Ninth Circuit decisions regarding the duty (or lack thereof) to disclose unfavorable events generally. *See* 89 F.3d at 1406–07 (citing *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 515 (9th Cir. 1991) for the proposition that "[t]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit"; and citing *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1420 (9th Cir. 1994) for the proposition that "a company is not required to forecast future events or to caution that future prospects [may not be] as bright as past performance") (alteration in original) (quotation marks omitted).

Plaintiff's reliance on this Court's decisions in *In re Alphabet, Inc. Securities Litigation* and *In re Facebook, Inc. Securities Litigation* does not suggest otherwise. 1 F.4th 687 (9th Cir. 2021); 87 F.4th 934 (9th Cir. 2023), *cert. granted in part sub nom. Facebook, Inc. v. Amalgamated Bank*, 144 S. Ct. 2629 (2024) (mem.). Those decisions cover a different situation from that described in *Stac* (and here)—where the issuer improperly fails to disclose an unfavorable event that *already has* occurred. In *Facebook*, "shareholders … adequately pleaded falsity" by alleging that "although Facebook knew Cambridge Analytica had improperly accessed and

used Facebook users' data," Facebook filed a 10-K stating only that "users' data *may* be improperly accessed, used, or disclosed." 87 F.4th at 948–49 (emphasis in original). In other words, "Facebook represented the risk of improper access to or disclosure of Facebook user data as purely hypothetical when that exact risk had already transpired." *Id.* at 949. That was misleading because a "reasonable investor reading the 10-K statement would have understood the risk of a third party accessing and utilizing Facebook user data improperly to be merely conjectural." *Id.*

Similarly, in *Alphabet*, defendant discovered that a privacy bug had been present on its systems for the past three years, exposing vast amounts of private profile data to third parties. 1 F.4th at 695. Despite this discovery, defendant filed quarterly reports stating that there had been "no material changes to [its] risk factors" since its prior report. That prior report, in turn, had warned that "*even unfounded* concerns about Alphabet's 'practices with regard to the collection, use, disclosure, or security of personal information or other privacy related matters' could damage the company's 'reputation and adversely affect [its] operating results.'" *Id.* at 702 (emphasis added). The Court concluded that Alphabet's continuing to describe those risks of reputational harm as purely hypothetical was misleading when that risk had already "materialized" due to the privacy bug. *Id.* at 704.

Unlike in *Alphabet* and *Facebook*, ON24 did not know of, yet fail to disclose, any adverse event that had already occurred, because plaintiff fails to plausibly

51

allege that any material churn pre-dated the IPO. *Supra* pp. 32-35. Rather, as of the IPO, all that might have existed—as with any company—was a risk of future churn. Even assuming *Alphabet* and *Facebook* somehow required ON24 to make non-"hypothetical" disclosures about that risk and the future harms that could arise, ON24 did precisely what those decisions require. ON24 disclosed an actual risk (the possibility of decreased demand) and connected it to real-world events that might occur (potential changes in pandemic restrictions). *E.g.*, ER-63–64 (¶182) (warning that "[i]f fewer new enrollments or renewals occur as the impact of COVID-19 lessens, [ON24's] cash and deferred revenue as of future dates may decrease").

Ultimately, plaintiff's theory boils down to the notion that ON24 should have predicted to a certainty that material churn would occur. Opening Br. 47 (taking issue with ON24's use of the terms "may" and "if" when describing the risk of non-renewal as COVID restrictions eased). But *Alphabet* and *Facebook* do not demand issuers become clairvoyant; they require disclosing only what has already "materialized." *Alphabet*, 1 F.4th at 704; *accord Stac*, 89 F.3d at 1406–07; *In re Convergent*, 948 F.2d at 515 (issuer must disclose when "unfavorable events … have already occurred"); *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1483 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993) (securities laws "do[] not provide a basis of liability where a corporation fails to 'disclose' the future"). The risk disclosures

walked investors through all that had already materialized and all that might occur as a result; ON24 could do no more.[4]

### E. Plaintiff's Reliance On Regulation S-K Fails Because Plaintiff Has Failed To Plausibly Allege That ON24 Failed To Disclose Any Pre-IPO Churn Or Risk Of Post-IPO Churn

Plaintiff also attempts to establish a Section 11 violation by arguing that ON24 violated Items 105 and 303 of SEC Regulation S-K. The district court concluded that "because plaintiff has not provided sufficient factual support for its claim that ON24 was experiencing significant customer churn or risk of churn, it has not met its burden of demonstrating that ON24 violated its duty to disclose under either Item." ER-18. Plaintiff has failed to show any error in that prior reasoning, so this argument fails too. *See supra* pp. 22-44.

*Item 105.* Item 105 requires that issuers "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a). To the extent this imposed any disclosure requirement on ON24, it satisfied that requirement. ON24 explained

---

[4] Moreover, the Supreme Court has granted certiorari in *Facebook* on the question of whether risk disclosures are misleading "when they do not disclose that a risk has materialized in the past, even if that past event presents no known risk of ongoing or future business harm." Pet. for Writ of Certiorari i, *Facebook, Inc. v. Amalgamated Bank*, No. 23-980 (U.S. Mar. 4, 2024). Although *Facebook* does not help plaintiff's claims for the reasons discussed above, should the Supreme Court reverse the judgment, plaintiff's reliance on that decision would be even more tenuous.

how the pandemic had increased its business and the possibility that this situation would change. The company stated that its "recent revenue growth has been significantly impacted by an increasing demand for our platform and products following the onset of the COVID-19 pandemic and resulting precautionary measures." ER-63 (¶181). And it warned that "[a]s the impact of COVID-19 lessens, there may be reduced demand for our platform, and our revenue growth rate may decline. If these new customers elect not to continue their subscriptions as the impact of COVID-19 lessens, our business, financial condition and results of operations would be harmed." ER-63 (¶181).

Plaintiff argues that "boilerplate" disclosures do not satisfy Item 105. Opening Br. 49 (quoting *Silverstrand Invs. v. AMAG Pharms., Inc.*, 707 F.3d 95, 103 (1st Cir. 2013)). Maybe so, but ON24's disclosures were anything but boilerplate. They specifically "explain[ed] how the risk affects the ... securities being offered," *Silverstrand*, 707 F.3d at 103 (ellipsis in original): namely, the risk that changes in pandemic behavior could cause a decline in demand, which could in turn harm ON24's financial condition. Plaintiff (at 50) also recycles its argument that ON24 improperly described future churn as a possibility rather than a certainty. But that argument fails for all the reasons described above. *See supra* pp. 47-53.

***Item 303.*** Plaintiff's reliance on Item 303 fares no better. Item 303 requires offering documents to disclose "any known trends or uncertainties that have had or

that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or incomes from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). This means that a "disclosure duty exists where a trend, demand, commitment, event or uncertainty is both (1) presently known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operation." *Steckman*, 143 F.3d at 1296. Conversely, *no* disclosure is required "[i]f management determines that" a "known trend, demand, commitment, event or uncertainty" is "not reasonably likely to occur" *or* if management "determines that a material effect on the registrant's financial condition … is not reasonably likely to occur" as a result of that trend. 54 Fed. Reg. 22427, 22430 (May 24, 1989).

At the dismissal hearing, plaintiff explained (after being pressed to clarify multiple times by the district court) that the purported relevant trend was material churn before the IPO. 1-SER-29. Similarly, it argues here, with no support, that "demand declined in November and December 2020." Opening Br. 55. But plaintiff fails to allege any material churn occurred before the IPO, *supra* pp. 32-35, so there was nothing to disclose on that front. And again, ON24's financial metrics show the opposite.

Equally flawed is plaintiff's alternative (and forfeited) argument that the relevant trend is instead the risk of material churn that ON24's executives allegedly

discussed in internal company meetings in 2020. Opening Br. 54–55. As the district court recognized, plaintiff failed to allege any such "significant … risk of churn." ER-18; *supra* pp. 32-44 (explaining fatal inconsistencies and ambiguities in plaintiff's complaint, including as to attempts to quantify actual or potential churn). Regardless, plaintiff also failed to plausibly allege that ON24 expected a "material … unfavorable impact on net sales or revenues or incomes" as a result of any such risk. 37 C.F.R. § 229.303(b)(2)(ii). Indeed, plaintiff's complaint and the undisputed financial metrics support the precise opposite inference. ON24 expected to, and did, save accounts that might churn and thus avoided any unfavorable impact on sales and revenue. *Supra* pp. 29-30. If there was any trend at all, it was one of continued growth.

### F. Plaintiff's Remaining Challenges To The District Court's Ruling Fail

Plaintiff's remaining, scattershot challenges to the district court's dismissal order, many of which recycle prior arguments, fail too.

#### 1. *The district court applied the correct standard*

Plaintiff argues that the district court erred when it required plaintiff to allege intent in its Section 11 and 15 claims, which have no scienter requirement. Opening Br. 31–33. But the district court *applied* no intent standard. Although the district court used the word "intentionally" once in its order (ER-11), the district court asked only whether Section 11's elements were adequately pleaded—that is, whether the

statements were plausibly false or misleading. ER-11–17. Notably, plaintiff points to no part of the district court's substantive analysis that required it to allege intent, thus forfeiting any argument that potential error infected the court's analysis.

Even assuming the district court's stray use of the word "intentionally" was error, any such error would have been harmless. Because no part of the court's analysis turned on whether plaintiff had alleged intent, the court analyzed plaintiff's complaint under the proper legal framework. ER-11–17; *see, e.g.*, *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 973 (9th Cir. 2023) (legal error "harmless" when "the district court proceeded to analyze" facts "pursuant to the proper legal framework"). Regardless, any purported error could "not affect" this Court's analysis, which reviews dismissals under "Rule 12(b)(6) de novo." *DB Healthcare, LLC v. Blue Cross Blue Shield of Ariz., Inc.*, 852 F.3d 868, 874 n.5 (9th Cir. 2017).

### 2. *Plaintiff's isolated challenges to the second statement demonstrate no reversible error*

Plaintiff offers a grab-bag of arguments for why the second challenged statement—a concededly accurate description of ON24's past ARR growth, *supra* pp. 21, 24—is misleading. Opening Br. 42–44. None of those repetitive arguments demonstrates that the district court erred.

First, plaintiff argues the district court misconstrued its challenge to this statement as a claim "that ON24 misled potential investors by promising that ON24's business would … grow at the same explosive rate." Opening Br. 42; *see*

ER-17.  But if plaintiff is right that it made no such claim, the court could not have committed reversable error in rejecting it.  Rather, to obtain relief from this Court, plaintiff must demonstrate that all the reasons the district court gave for rejecting plaintiff's claims were wrong.

Second, citing only an unpublished district court decision, plaintiff argues that "once a company 'puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success.'"  Opening Br. 43 (citing *Melot v. JAKKS Pac., Inc.*, No. 13-cv-05388 JAK (SSx), 2014 WL 12589334, at *10 (C.D. Cal. June 6, 2014); *but see Melot*, 2014 WL 12589334, at *11 (dismissing complaint where, as here, statements were accurate descriptions of past performance and defendants "discussed the source of [their] sales revenue").  Whatever this Court thinks of that principle, ON24's statement did not violate it.  By its express terms, the challenged statement disclosed the sources of its success, including that its recent ARR growth was "partly" due "to the COVID-19 pandemic."  ER-59 (¶177).  Other statements in the same offering document clarify that "businesses accelerate[d] digital transformation initiatives in response to the COVID-19 pandemic, resulting in increased usage of our subscription and other platforms."  1-SER-112.

Third, plaintiff implies the statement is misleading because it did not disclose that the COVID-spurred growth was a "one-off type of deal."  Opening Br. 44.

Plaintiff gives ON24 too much credit in suggesting that ON24—or anyone else—could have predicted the future of pandemic-related restrictions and whether the resulting increase in demand for digital solutions would be a "one-off" situation or not. And to the extent a risk of that nature existed, ON24 warned investors of it in its disclosures. *See supra* pp. 35, 47-53.

## II. PLAINTIFF'S SECTION 15 CLAIM FAILS FOR THE SAME REASONS

Because plaintiff fails to plausibly allege a Section 11 violation, its claim for control-person liability against the individual defendants under Section 15 necessarily fails. *See* 15 U.S.C. § 77o; *In re Rigel*, 697 F.3d at 886.

\*\*\*

Finally, by "fail[ing] to raise it in the[] opening brief"—or to the district court in opposition to defendants' second motion to dismiss—plaintiff has doubly forfeited any argument that it should be allowed yet again to amend its complaint. *Steinle v. City & Cnty. of S.F.*, 919 F.3d 1154, 1167 (9th Cir. 2019). In any event, further amendment would be futile. In its first dismissal order, the district court made clear that plaintiff needed to provide "quantification" of the allegedly material churn ON24 faced to make its allegations plausible (ER-100)—but plaintiff's amended complaint made clear that it could not provide that quantification without fatal inconsistencies. Even if plaintiff could cure that flaw, its allegations would remain implausible given ON24's undisputed metrics and ON24's risk disclosures.

In the face of these insurmountable obstacles, plaintiff "fail[s] to state what additional facts [it] would plead if given leave to amend" again. *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1052 (9th Cir. 2008).

## CONCLUSION

The district court's dismissal with prejudice should be affirmed.

Dated: September 27, 2024

ANNA ERICKSON WHITE
DAVID J. WIENER
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

Respectfully submitted,

s/ Brian R. Matsui
BRIAN R. MATSUI
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, DC 20037
Tel.: (202) 887-8784
BMatsui@mofo.com

ALEXANDRA M. AVVOCATO
MORRISON & FOERSTER LLP
250 West 55th Street
New York, NY 10019

*Counsel for Defendants-Appellees ON24, Inc., Sharat Sharan, Steven Vattuone, Denise Persson, Holger Staude, Dominique Trempont, and Barry Zwarenstein*

60

s/ Thomas M. Peterson

THOMAS M. PETERSON
CHARLENE S. SHIMADA
KEVIN M. PAPAY
ROBERT H. O'LEARY
MORGAN, LEWIS & BOCKIUS LLP
One Market
Spear Street Tower
San Francisco, CA 94105
Tel: (415) 442-1000
thomas.peterson@morganlewis.com

*Counsel for Defendants-Appellees Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, KeyBanc Capital Markets Inc., Robert W. Baird & Co. Incorporated, Canaccord Genuity LLC, Needham & Company, LLC, Piper Sandler & Co., and William Blair & Company L.L.C.*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the ACMS system on September 27, 2024.

I certify that all participants in the case are registered ACMS users and that service will be accomplished by the ACMS system.

Dated: September 27, 2024                    s/ Brian R. Matsui
                                                            Brian R. Matsui

ny-2782672

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-2204

I am the attorney or self-represented party.

**This brief contains** | 13,999 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

🔘 complies with the word limit of Cir. R. 32-1.

⚪ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⚪ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

⚪ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

⚪ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

⚪ complies with the length limit designated by court order dated [          ].

⚪ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Brian R. Matsui | **Date** | Sept. 27, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*